1  THE O'MARA LAW FIRM, P.C.
   DAVID C. O'MARA, ESQ
2  Nevada Bar No. 8599
   311 E. Liberty Street
3  Reno, Nevada 89501
   Telephone:  775.323.1321
4  david@omaralaw.net

5  James E. Cecchi
   Lindsey H. Taylor
6  CARELLA, BYRNE, CECCHI
   OLSTEIN, BRODY & AGNELLO
7  5 Becker Farm Road
   Roseland, New Jersey 07068
8  (973) 994-1700

9  Christopher A. Seeger
   Stephen A. Weiss
10 SEEGER WEISS
   77 Water Street, 8th Floor
11 New York, New York 10005
   (212) 584-0700

12
   Samuel H. Rudman
13 ROBBINS GELLER RUDMAN
     & DOWD LLP
14
   58 South Service Road, Suite 200
15 Melville, NY  11747
   (631) 367-7100
16
   Paul J. Geller
17 Stuart A. Davidson
   ROBBINS GELLER RUDMAN
18   & DOWD LLP
   120 East Palmetto Park Road, Suite 500
19 Boca Raton, Florida 33432
   (561) 750-3000
20

21 Attorneys for Plaintiff

22                        UNITED STATES DISTRICT COURT

23                             DISTRICT OF NEVADA

24
   PROJECT LION LLC, d/b/a CRUSH d/b/a     )   No.
25 GREEK SNEEK, PROJECT M LLC d/b/a LA     )
   COMIDA, and PROJECT W LLC, d/b/a LA     )   COMPLAINT AND DEMAND FOR JURY
26 CAVE, Individually and on Behalf of All )   TRIAL
   Others Similarly Situated,              )
27                                         )
                          Plaintiffs,      )
28                                         )

                                    - 1 -

```
                                                     )
              vs.                                    )
                                                     )
         BADGER MUTUAL INSURANCE                     )
         COMPANY                                     )
                                                     )
                            Defendant.               )
                                                     )
     _____
```

Plaintiffs, Project Lion LLC, d/b/a Crush d/b/a Greek Sneek, Project M LLC d/b/a La Comida, and Project W LLC, d/b/a La Cave, (collectively "Plaintiffs"), by way of Complaint against Defendant Badger Mutual Insurance Company ("Defendant" or "Badger"), allege as follows:

## INTRODUCTION

1.     On March 11, 2020 World Health Organization Director General Tedros Adhanom Ghebreyesus declared the COVID-19 outbreak a worldwide pandemic: "WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction. We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[1]

2.     On March 16, 2020, the Centers for Disease Control and Prevention, and members of the national Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread" for stopping the spread of COVID-19. This guidance advised individuals to adopt far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than 10 people, and staying away from bars, restaurants, and food courts.[2]

3.     Following this advice for individuals to adopt far-reaching social distancing measures, many state government administrations across the nation recognized the need to take steps to protect the health and safety of their residents from the human to human and surface to

---

[1]     *See*  https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the- media-briefing-on-COVID-19 11-march-2020

[2]     https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf

human spread of COVID-19. As a result, many governmental entities entered civil authority orders suspending or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals. Currently, almost all states within the United States have issued some sort of "stay-at-home" order and ordered private non-essential business operations to close.

4.     The result of these far-reaching restrictions and prohibitions has been catastrophic for most non-essential businesses, especially restaurants and other foodservice businesses, as well as retail establishments, entertainment venues, and other small, medium, and large businesses who have been forced to close, furlough employees, and endure a sudden shutdown of cash flow that threatens their survival.

5.     Most businesses insure against such catastrophic events like the current unforeseen COVID-19 pandemic through all-risk commercial property insurance policies. These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, curtailed, when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order that restricts or prohibits access to the property. This coverage is commonly known as "business interruption coverage" and is standard in most all-risk commercial property insurance policies.

6.     Defendants, and most insurance companies who have issued all-risk commercial property insurance policies with business interruption coverage, are denying the obligation to pay for business income losses and other covered expenses incurred by policyholders for the physical loss and damage to the insured property from measures put in place by the civil authorities to stop the spread of COVID-19 among the population.  This action seeks a declaratory judgment that affirms that the COVID-19 pandemic and the corresponding response by civil authorities to stop the spread of the outbreak triggers coverage, has caused physical property loss and damage to the insured property, provides coverage for future civil authority orders that result in future suspensions or curtailments of business operations, and finds that Defendants are liable for the losses suffered by policyholders.

7. Plaintiffs bring this action on behalf of a proposed class of policyholders who paid premiums in exchange for business insurance policies that included lost business income and extra expense coverage.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) in that this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the putative class is a citizen of a different State than that of one of the Defendants.

9. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) in that Defendants do business in this District and thus reside in this District, in accordance with 28 U.S.C. §1391(c).

**PARTIES**

10. Plaintiff Project Lion LLC, d/b/a Crush d/b/a Greek Sneek ("Crush") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.

11. Plaintiff Project M LLC d/b/a La Comida ("La Comida") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.

12. Plaintiff Project W LLC, d/b/a La Cave ("La Cave") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.

13. Plaintiffs all operate food service establishments in Las Vegas, Nevada.

14. Defendant Badger Mutual Insurance Company is a mutual insurance company organized under the laws of the State of Wisconsin with its principal place of business in Milwaukee, Wisconsin.

15. Badger issued to Crush Policy Number 00669-7047 covering the policy period form November 19, 2019 through November 19, 2020.

16. Badger issued to La Comida Policy Number 00661-51887 covering the policy period from April 20, 2019 through April 20, 2020.

17. Badger issued to La Cave Policy Number 00653-07924 covering the policy period from August 16, 2019 through August 16, 2020.

**FACTUAL BACKGROUND**

**A.      The Global COVID-19 Pandemic**

18.      Viruses of the family Coronaviridae, such as Middle East respiratory syndrome (MERS) coronavirus (MERS-CoV) and severe acute respiratory syndrome (SARS) coronavirus (SARS-CoV), have been responsible for the loss of human life since at least 2002 and were identified in several animal hosts.[3]

19.      In December 2019, an initial cluster of nine patients with an unknown cause of viral pneumonia was found to be linked to the Huanan seafood market in Wuhan, China, where many non-aquatic animals such as birds were also on sale.  However, one of the patients never visited the market, though he had stayed in a hotel nearby before the onset of the illness.[4]

20.      By January 2020, genetic sequencing from patient samples was conducted to identify a novel virus, SARS-CoV-2, as the causative agent for the pneumonia cluster.[5]  SARS-CoV-2 is an RNA virus, with a crown-like appearance under an electron microscope because of glycoprotein spikes on its envelope.  Among the functions of the structural proteins, the envelope has a crucial role in virus pathogenicity as it promotes viral assembly and release.[6]

---

[3]      See   https://www.cdc.gov/coronavirus/2019-ncov/downloads/genomic-characterization-of-2019-nCoV-Lancet-1-29-2020.pdf (There are four genera of CoVs: (I) α-coronavirus (alphaCoV), (II) β-coronavirus (betaCoV) probably present in bats and rodents, while (III) δ-coronavirus (deltaCoV), and (IV) γ-coronavirus (gammaCoV) probably represent avian species)

[4]      See https://www.mdpi.com/1660-4601/17/8/2690 (As a typical RNA virus, the average evolutionary rate for coronaviruses is roughly 10–nucleotide substitutions per site per year, with mutations arising during every replication cycle. This finding suggests that 2019-nCoV originated from one source within a short period and was detected rapidly. However, as the virus transmits to more individuals, constant surveillance of mutations arising is needed.) See Lu R, Zhao X, Li J, et al. Genomic characterisation and epidemiology of 2019 novel coronavirus: implications for virus origins and receptor binding. Lancet (London, England). 2020 Feb;395(10224):565-574. DOI: 10.1016/s0140-6736(20)30251-8. (This finding suggests either possible droplet transmission or that the patient was infected by a currently unknown source. Evidence of clusters of infected family members and medical workers has now confirmed the presence of human-to-human transmission.)

[5]      https://www.mdpi.com/1660-4601/17/8/2690

[6]      See   https://www.mdpi.com/1660-4601/17/8/2690 (To address the pathogenetic mechanisms of SARS-CoV-2, its viral structure and genome must be considered. Coronaviruses are enveloped positive strand RNA viruses with the largest known RNA genomes—30–32 kb—with a 50 -cap structure and 30 -poly-A tail.)

- 5 -

21.     The first confirmed case of the virus outside China was diagnosed on January 13, 2020 in Bangkok, Thailand with the number of cases exceedingly increasing worldwide.   On January 30, 2020, the World Health Organization (WHO) declared the SARS-COv-2 outbreak constituted a public health emergency of international concern, and by February 11, 2020, the virus was named "COVID-19" by the WHO Director-General.[7]   As of April 15, 2020, the WHO reports a confirmed 1.9 million cases of COVID-19 globally and over 123,000 deaths, with the United States dealing with more than 578,000 confirmed cases and 23,000 deaths - more than any other country.[8]

22.     The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that requires ventilation and support in an intensive care unit (ICU).   Pneumonia has been the most frequent severe manifestation of COVID-19, with symptoms of fever, cough, dyspnea, and bilateral infiltrates on chest imaging.[9]   There are no specific treatments recommended for COVID-19, and no vaccine is currently available; so understanding the complexities of COVID-19 is ongoing.[10]

23.     It has now been discovered by scientists that COVID-19 has several modes of transmission.   Pursuant to a "Situation Report" released by the WHO, the virus can be transmitted through    symptomatic    transmission,    pre-symptomatic    transmission,    or    asymptomatic

---

[7]        https://www.mdpi.com/1660-4601/17/8/2690

[8]        https://covid19.who.int/

[9]        *See*   https://www.mdpi.com/1660-4601/17/8/2690 (Asymptomatic infections have also been described, but their frequency is unknown...Other, less common symptoms have included headaches, sore throat, and rhinorrhea. Along with respiratory symptoms, gastrointestinal symptoms (e.g., nausea and diarrhea) have also been reported, and in some patients they may be the presenting complaint.)

[10]        *See*   https://www.mdpi.com/1660-4601/17/8/2690 (The treatment is symptomatic, and oxygen therapy represents the major treatment intervention for patients with severe infection. Mechanical ventilation may be necessary in cases of respiratory failure refractory to oxygen therapy, whereas hemodynamic support is essential for managing septic shock [37]. Different strategies can be used depending on the severity of the patient and local epidemiology [38,39]. Home management is appropriate for asymptomatic or paucisintomatic patients. They need a daily assessment of body temperature, blood pressure, oxygen saturation and respiratory symptoms for about 14 days. Management of such patients should focus on prevention of transmission to others and monitoring for clinical status with prompt hospitalization if needed.)

1    transmission.[11]    Symptomatic transmission refers to transmission by an individual who is

2    experiencing symptoms associated with the virus who then transfers COVID-19 to another

3    individual.  Data from published studies provide evidence that COVID-19 is primarily transmitted

4    from symptomatic people to others who are in close contact through respiratory droplets, by direct

5    contact with infected persons, or by contact with contaminated objects and surfaces.[12]

6        24.    The incubation period for COVID-19, which is the time between exposure to the

7    virus (becoming infected) and symptom onset, averages 5-6 days, however, it can be up to 14

8    days.[13] During this period, also known as the "presymptomatic" period, some infected persons can

9    be contagious.  For that reason, transmission from a pre-symptomatic case can occur before

10   symptom onset.   Presymptomatic transmission still requires the virus to be spread through

11   infectious droplets or touching contaminated surfaces.[14]

12       25.    An individual who does not develop symptoms, an asymptomatic case of COVID-

13   19, can still transmit the virus to another.  Though there are few documented cases reported, it does

14   not exclude the possibility that it has or may occur.[15]

15

---

16   [11]    https://www.who.int/docs/default-source/coronavirus/situation-reports/20200402-sitrep-
17   73-covid-19.pdf?sfvrsn=5ae25bc7_2

18   [12]    *See* https://www.who.int/docs/default-source/coronavirus/situation-reports/20200402-
     sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (Data from clinical and virologic studies that have
19   collected repeated biological samples from confirmed patients provide evidence that shedding of
     the COVID-19 virus is highest in upper respiratory tract (nose and throat) early in the course of
20   the disease. That is, within the first 3 days from onset of symptoms. Preliminary data suggests
     that people may be more contagious around the time of symptom onset as compared to later on
21   in the disease.)

22   [13]    https://www.who.int/docs/default-source/coronavirus/situation-reports/20200402-sitrep-
     73-covid-19.pdf?sfvrsn=5ae25bc7_2

23   [14]    *See*    https://www.who.int/docs/default-source/coronavirus/situation-reports/20200402-
24   sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (In a small number of case reports and studies, pre-
     symptomatic transmission has been documented through contact tracing efforts and enhanced
25   investigation of clusters of confirmed cases. This is supported by data suggesting that some people
     can test positive for COVID-19 from 1-3 days before they develop symptoms. Thus, it is possible
26   that people infected with COVID-19 could transmit the virus before significant symptoms
     develop.)

27   [15]    https://www.who.int/docs/default-source/coronavirus/situation-reports/20200402-sitrep-
28   73-covid-19.pdf?sfvrsn=5ae25bc7_2

26.     Not only is COVID-19 transmitted via human-to-human, but the WHO and scientific studies have confirmed that the virus can live on contaminated objects or surfaces. According to a study by scientists documented in *The New England Journal of Medicine*, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard, and up to two to three days on plastic and stainless steel.[16]  All of these materials are used in the preparation and service of food by restaurants.  The results of the study suggest that individuals could get COVID-19 through indirect contact with surfaces or objects used by an infected person, whether they were symptomatic.

27.     Another scientific study documented in the *Journal of Hospital Infection* found that human coronaviruses, such as SARS-CoV and MERS-CoV can remain infectious on inanimate surfaces at room temperature for up to nine days.[17] At a temperature of 30 degrees Celsius or more, the duration of persistence is shorter. Contamination of frequently touched surfaces is, therefore, a potential source of viral transmission.[18]  Though this study was not conclusive on COVID-19 itself, scientists are still grappling to understand this implication.

28.     On March 27, 2020, the Centers for Disease Control and Prevention ("CDC") released a report entitled *"Public Health Responses to COVID-19 Outbreaks on Cruise Ships -*

---

[16]  *See*   https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces; *See*   https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations (In the context of COVID-19, airborne transmission may be possible in specific circumstances and settings in which procedures or support treatments that generate aerosols are performed; *i.e.*, endotracheal intubation, bronchoscopy, open suctioning, administration of nebulized treatment, manual ventilation before intubation, turning the patient to the prone position, disconnecting the patient from the ventilator, non-invasive positive-pressure ventilation, tracheostomy, and cardiopulmonary resuscitation.)

[17]         *See*         https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3

[18]         *See*         https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (Although the viral load of coronaviruses on inanimate surfaces is not known during an outbreak situation it seem plausible to reduce the viral load on surfaces by disinfection, especially of frequently touched surfaces in the immediate patient surrounding where the highest viral load can be expected. The WHO recommends "to ensure that environmental cleaning and disinfection procedures are followed consistently and correctly.")

*Worldwide, February - March 2020.*"[19]   The report detailed that during this time frame, COVID-19 outbreaks associated with three different cruise ship voyages caused over 800 confirmed cases and 10 deaths.[20]   Of the individuals tested, a high proportion were found to be asymptomatic, which may explain the high rates on cruise ships.  What is interesting about this study though, is that COVID-19 was identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond Princess cruise line, but before disinfection procedures had been conducted.[21]   The CDC notes that more studies are required to understand the perpetuation of transmission, but what is clear is the uncertainty around COVID-19 and its implications for the lawful and safe functioning of a variety of businesses, most significantly, food service businesses

29.     Without a vaccine to protect against COVID-19, effective control of the outbreak relies on measures designed to reduce human to human and surface to human exposure. Recent

---

[19]      https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w

[20]      *See*     https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w (During February 7–23, 2020, the largest cluster of COVID-19 cases outside mainland China occurred on the Diamond Princess cruise ship, which was quarantined in the port of Yokohama, Japan, on February 3 (*3*). On March 6, cases of COVID-19 were identified in persons on the Grand Princess cruise ship off the coast of California; that ship was subsequently quarantined. By March 17, confirmed cases of COVID-19 had been associated with at least 25 additional cruise ship voyages. On February 21, CDC recommended avoiding travel on cruise ships in Southeast Asia; on March 8, this recommendation was broadened to include deferring all cruise ship travel worldwide for those with underlying health conditions and for persons aged ≥65 years. On March 13, the Cruise Lines International Association announced a 30-day voluntary suspension of cruise operations in the United States. CDC issued a level 3 travel warning on March 17, recommending that all cruise travel be deferred worldwide.)

[21]      *See*     https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w (Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between travelers from many countries, and crew transfers between ships. On the Diamond Princess, transmission largely occurred among passengers before quarantine was implemented, whereas crew infections peaked after quarantine/ On the Grand Princess, crew members were likely infected on voyage A and then transmitted SARS-CoV-2 to passengers on voyage B. The results of testing of passengers and crew on board the Diamond Princess demonstrated a high proportion (46.5%) of asymptomatic infections at the time of testing. Available statistical models of the Diamond Princess outbreak suggest that 17.9% of infected persons never developed symptoms. A high proportion of asymptomatic infections could partially explain the high attack rate among cruise ship passengers and crew...Although these data cannot be used to determine whether transmission occurred from contaminated surfaces, further study of fomite transmission of SARS-CoV-2 aboard cruise ships is warranted.)

1   information on the CDC's website provides that COVID-19 spreads when people are within six feet

2   of each other or when a person comes in contact with a surface or object that has the virus on it.[22]

3   Various other sources state that close contact with a person with the virus or surfaces where the

4   virus is found can transmit the virus.[23]

5      30. The secondary exposure of the surface to humans is particularly acute in places

6   where the public gathers typically to socialize, eat, drink, shop, be entertained, and go for

7   recreation. This is why the CDC recommends that in viral outbreaks individuals who are infected

8   stay at home and those who are not sick engage in preventive measures such as constant hand

9   washing and avoiding activities that would bring them into close proximity of people with the virus

10  or surfaces where the virus may reside. However, because these recommendations have proven

11  ineffective to minimize the spread of COVID-19, containment efforts have led to civil authorities

12  issuing orders closing non-essential business establishments, including restaurants, bars, hotels,

13  theaters, personal care salons, gyms, and schools, and mandating social distancing among the

14  population. This has caused the cancelation of sporting events, parades, and concerts, the closure of

15  amusement parks, and substantial travel restrictions. In addition, to conserve medical supplies,

16  orders have been issued prohibiting the performance of non-urgent or non-emergency elective

17  procedures and surgeries, forcing the suspension of operations at many medical, surgical,

18  therapeutic, and dental practices.

19     31. All but six states have enacted "stay-at-home" orders, thirty-five states have closed

20  all non-essential businesses with other states enacting measures to curtail business operations, all

21

22

---

23  [22] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID-

24  spreads.html

25  [23] *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, Vol. 104, Kemp., G., et al., Journal of Hospital Infection, No. 3, March 2020, pages 246-

26  251 (remains infectious from 2 hours to 28 days depending on conditions); see also https://www.ucsf.edu/news/2020/02/416671/how-new-coronavirus-spreads-and-progresses-and-

27  why-one-test-may-not-be-enough (doorknobs and table tops can contain the virus); https://www.nytimes.com/2020/03/02/health/coronavirus-how-it-spreads.html (virus can remain

28  on metal, glass and plastic for several days).

1   fifty states have closed schools, and all but one state has closed restaurants and bars for services

2   other than take-out and delivery (the "Closure Orders").[24]

3   **B.    Defendants' Standard Uniform All-Risk Commercial Property Insurance Policies**

4          32.    Badger's insurance policies issued to Plaintiffs and the Class Members are "all risk"

5   commercial property polices which cover loss or damage to the covered premises resulting from

6   all risks other than those expressly excluded.

7          33.    Plaintiffs' Policies, as well as the policies of other Class Members, are standard

8   forms that are used by Badger for all insureds having applicable coverage.

9   **C.    Plaintiffs' Factual Allegations**

10         34.    Among the coverages provided by the Policies was business interruption insurance,

11  which, generally, would indemnify Plaintiffs for lost income and profits in the event that their

12  businesses were shut down.

13         35.    The Policies issued by Badger to Plaintiffs were identical with respect to applicable

14  business interruption coverage.

15         36.    The Business Income And Extra Expense coverage form, CP-70D Ed. 1-01

16  provides coverage for Plaintiffs as follows:

17         **We** will pay for the actual loss of Business Income **you** sustain due to the necessary
           suspension of **your operations** during the **period of restoration**. The suspension
18         must be caused by direct physical loss of or damage to property at the described
           premises. The loss or damage must be caused by or result from a Covered Cause of
19         Loss. With respect to loss of or damage to personal property in the open or personal
           property in a vehicle, the described premises include the area within 100 feet of the
20         site at which the described premises are located.

21         37.    The Policies also provide that

22         **We** will pay necessary Extra Expenses **you** incur during the **period of restoration**
           that **you** would not have incurred if there had been no direct physical loss or damage
23         to property at the described premises. The loss or damage must be caused by or
           result from a Covered Cause of Loss. With respect to loss of or damage to personal
24         property in the open or personal property in a vehicle, the described premises
           include the area within 100 feet of the site at which the described premises are
25         located.

26

27  _____

    [24]            https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-
28  coronavirus/.

38.     The Policy defines Business Income as:

    a.    Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred; but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

    b.    Continuing normal operating expenses incurred, including payroll

39.     The Policy defines Extra Expense expenses incurred:

    a.    to avoid or minimize the suspension of business and to continue **operations**

        1)    at the described premises; or

        2)    at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

    b.    To minimize the suspension of business if you cannot continue **operation**s.

    c.    To repair or replace any property or to research, replace or restore the lost information in damaged **valuable papers** and records.

        to the extent it reduces the amount of loss that otherwise would have been payable under this Supplemental Coverage.

40.     Under the Policies' Specials Perils Part, form CP-85 Ed. 1.0, Badger Mutual agreed to "cover risks of direct physical loss unless the loss is limited or caused by a peril that is excluded."

41.     Plaintiffs and all similarly situated Class members have suffered a direct physical loss of and damage to their property because they have been unable to use their property for its intended purpose.

42.     Plaintiffs' Policies contain an exclusion for Civil Authority, which provides:

    **We** do not cover loss caused by order of civil authority, including seizure, confiscation, destruction, or quarantine of property.

    **We** cover loss resulting from acts of destruction by civil authority to prevent the spread of fire, unless the fire is caused by a peril excluded under the policy.

43.     The Civil Authority exclusion is not applicable to Plaintiffs' claims because the Closure Orders and other orders of civil authority generally applicable to businesses, not as a result

1   of any contamination of Plaintiffs' particular property, and Plaintiffs' property was not seized,

2   confiscated, destroyed, quarantined, or the subject of any similar action by civil authority.

3         44.     Plaintiffs' Policies also contain an endorsement Virus or Bacteria Exclusion, form

4   0700 10 06, which provides:

5         We do not pay for any loss, cost or expense caused by, resulting from, or relating
          to any virus, bacterium or other microorganism that causes disease, illness or
6         physical distress or that is capable of causing disease, illness or physical distress.

7         This exclusion applies to, but is not limited to, any loss, cost or expense as a result
          of:
8
          a.     any contamination by any virus, bacterium or other microorganism; or
9
          b.     any denial of access to property because of any virus, bacterium or other
10               microorganism.

11        45.     The exclusion contained in the Virus and Bacteria endorsement is not applicable

12   because Plaintiffs;, and other class members', losses were not caused by a "virus, bacterium or

13   other microorganism that induces or is capable of inducing physical distress, illness or disease",

14   Rather, the efficient proximate cause of Plaintiffs', and other Class Members' losses, were

15   precautionary measures taken by the governments of their respective States to prevent the spread

16   of COVID-19 in the future, not because coronavirus was found in or on Plaintiffs' insured

17   property.

18   **D.   The COVID-19 Pandemic has Affected Policyholders Nationwide**.

19        46.     COVID-19 is physically impacting private commercial property in Nevada and

20   throughout the United States, threatening the survival of thousands of restaurants, retail

21   establishments, and other businesses that have had their business operations suspended or curtailed

22   indefinitely by order of civil authorities.

23        47.     No insurer intends to cover any losses caused by the COVID-19 pandemic.

24        48.     For example, a bipartisan group from the U.S. House of Representatives recently

25   sent a letter to various insurance industry trade groups requesting that their members recognize

26   financial losses relating to COVID-19 under the standard commercial interruption coverage. In

27   response, the industry trade groups stated: "Business interruption policies do not, and were not

28

designed to, provide coverage against communicable diseases such as COVID-19."[25] Upon information and belief, Badger belongs to and supports the trade groups' position.

49.     In addition, many state departments of insurance have issued advisories to business owners that COVID-19 is not an insured peril and there will be no coverage for business interruption. This is disinformation being published to discourage business owners from filing claims.

50.     For instance, Arkansas Insurance Department Bulletin No. 9-2020 states that "In most BII policies, coverage is triggered when the policyholder sustains physical damage to insured property caused by a covered peril resulting in quantifiable business interruption loss . .   . viruses and disease are typically NOT an insured peril unless added by endorsement (emphasis in the original).[26]

51.     The South Carolina Department of Insurance issues "Guidance" on business interruption insurance stating that under the business income policy, there likely is no coverage from losses resulting from a virus.[27]

52.     Members of the insurance industry have also been actively advising Insurance Commissioners that they do not intend to provide coverage for business interruption related to COVID-19. As a result, many small businesses that maintain commercial multi-peril insurance policies with business interruption coverage will have significant uninsured losses because the insurance industry is stating that such policies do not cover COVID-19.

53.     For instance, the State of Connecticut Insurance Department, Maryland Insurance Administration and the West Virginia Office of the Insurance Commissioner issued nearly identical notices supporting the insurance companies' reasons for denying business interruption

---

[25] https://www.insurancejournal.com/news/national/2020/03/20/561810.htm

[26] https://insurance.arkansas.gov/uploads/resource/documents/9-2020.pdf

[27] https://www.doi.sc.gov/948/COVID-19

1   claims, stating that the potential loss costs from such perils [like COVID-19] are so extreme that

2   providing coverage would jeopardize the financial solvency of property insurers.[28]

3          54.     John F. King, Insurance and Safety Fire Commission for the State of Georgia issued

4   Bulletin 20-EX-3 stating that losses from COVID-19 are excluded losses.[29] Vicki Schmidt, Kansas

5   Insurance Department Commission issued a similar Bulletin stating it was her "understanding it is

6   unlikely that a business policy would cover losses related to COVID-19."[30]

7          55.     Other state governments expect that insurance companies will breach their

8   obligation to provide coverage for business losses due to the COVID-19 pandemic and have

9   introduced bills requiring every insurance policy insuring against loss or damage to property,

10  which includes the loss of use and occupancy and business interruption, be construed to include,

11  among other covered perils, coverage for business interruption because of global virus

12  transmission or pandemic.[31]

13         56.     A declaratory judgment determining that the business income loss and extra

14  expense coverage provided in common all-risk commercial property insurance policies applies to

15  the suspension, curtailment, and interruption of business operations resulting from measures put

16  into place by civil authorities is necessary to prevent the Plaintiffs and similarly situated Class

17  members from being denied critical coverage for which they have paid.

18                          **CLASS ACTION ALLEGATIONS**

19         57.     Plaintiffs bring this lawsuit pursuant to Federal Rule of Civil Procedure 23(a) and

20  (b)(2) on behalf of themselves and all other persons similarly situated.

21

---

22  [28]    *See*   https://portal.ct.gov/CID/Coronavirus/Business-Interruption-Insurance-Notice;
23  https://insurance.maryland.gov/Pages/newscenter/NewsDetails.aspx?NR=2020256;
    https://www.wvinsurance.gov/Portals/0/pdf/pressrelease/20-
24  08%20Business%20Interruption%20Insurance.pdf?ver=2020-03-26-222830-620.

25  [29]    https://www.oci.ga.gov/ExternalResources/Announcements/Bulletin-3172020-1619.pdf.

26  [30]    https://insurance.ks.gov/documents/department/COVID19-FAQ.pdf.

27  [31]    *See* House Bill No. 858, State of Louisiana House of Representatives. Similar legislation
    has been introduced in Massachusetts (Senate Bill Senate Docket. 2888); New Jersey (Assembly
28  No. 3844); Sate of New York (Assembly 10226); and Ohio (House Bill No. 589).

58.     The Nationwide Class is defined as:

All entities who have entered into standard all-risk commercial property insurance policies with Badger, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures civil authorities' stay-at-home or shelter-in-place orders since March 15, 2019.

The Nevada Sub-Class is defined as:

All entities who have entered into standard all-risk commercial property insurance policies with Badger to insure property in Nevada, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures civil authorities' stay-at-home or shelter-in-place orders since March 15, 2019.

Excluded from each class are the Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

59.     Plaintiffs reserve the right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

60.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would prove those elements in individual actions alleging the same claims.

**Numerosity**

61.     This action satisfies the requirements of Fed.R.Civ.P. 23(a)(1). The Class numbers at least in the hundreds and consists of geographically dispersed business entities who are insured for business interruption losses. Badger sells many insurance policies in the State of Nevada and most, if not all, other states and therefore joinder of the Class members is impracticable.

62.     The identity of Class members is ascertainable, as the names and addresses of all Class members can be identified in Badger's or their agent's books and records. Plaintiffs anticipate providing appropriate notice to the certified Class in compliance with Fed.R.Civ.P.

23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Typicality**

63.     This action satisfies the requirements of Fed.R.Civ.P. 23(a)(3) because Plaintiffs' claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same all-risk commercial property insurance policy provisions entered into with Badger. Each Class member's insurance policy contains the same form providing coverage for business income loss. None of the forms exclude coverage due to a governmental action intended to reduce the effect of the ongoing global pandemic. As a result, a declaratory judgment as to the rights and obligations under Plaintiffs' Policy will address the rights and obligations of all Class members.

**Adequacy of Representation**

64.     Plaintiffs are committed to prosecuting the action, will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class action litigation, including litigation relating to insurance policies. Plaintiffs have no interests antagonistic to or in conflict with other members of the Class. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

**Commonality**

65.     This action satisfies the requirements of Fed.R.Civ.P. 23(a)(2) because there are questions of law and fact that are common to each of the classes. The questions of law and fact common to the Class include, but are not limited to:

a.     Whether there is an actual controversy between Plaintiffs and Badger as to the rights, duties, responsibilities and obligations of the parties under the business interruption coverage provisions in standard all- risk commercial property insurance policies;

b.     Whether measures to reduce the spread of the COVID-19 pandemic are excluded from Plaintiffs' and the Class members standard all-risk commercial property insurance policies;

c.     Whether the measures put in place by civil authorities to stop the spread of COVID-19 caused physical loss or damage to covered commercial property;

d.    Whether Badger has repudiated and anticipatorily breached the all-risk commercial property insurance policies the issued with business interruption coverage by intending to deny claims for coverage; and

e.    Whether Plaintiffs and the Class members suffered damages as a result of the anticipatory breach by Badger.

**Superiority/Predominance**

66.    A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members. The joinder of individual Class members is impracticable because of the vast number of Class members who have entered into the standard all-risk commercial property insurance policies with the Defendants.

67.    Because a declaratory judgment as to the rights and obligations under the uniform all-risk commercial property insurance policies will apply to all Class members, most or all Class Members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to Badger, by even a small fraction of the Class members, would be enormous.

68.    In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member. The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is superior to other alternatives under Fed.R.Civ.P. 23(b)(3)(D). Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit.

69.    Plaintiffs know of no obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.

**Rule 23(b)(2)**

70.     This action satisfies the requirements of Fed.R.Civ.P. 23(b)(2). The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendant.

71.     In addition, the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

72.     Defendant has also acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

73.     Finally, the Court may, on motion of Plaintiffs or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Rule 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Rule 23(c)(5) to divide any Class into subclasses.

**COUNT I**
**DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE**
**(Claim Brought on Behalf of the National Class and Nevada Subclass)**

74.     Plaintiffs repeat the allegations set forth in paragraphs 1-75 as if fully set forth herein.

75.     Plaintiffs bring this Count individually and on behalf of the other members of the National Class and Nevada Subclass.

76.     Plaintiffs' Badger Policies, as well as those of the other Class Members, are contracts under which Badger was paid premiums in exchange for its promise to pay Plaintiffs' and the other Class Members' losses for claims covered by the Policy.

77.     Plaintiffs and other Class Members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Badger or Badger is estopped from

asserting them, and yet Badger has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and Class Members are entitled.

78.     Badger has denied claims related to COVID-19 on a uniform and class-wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

79.     An actual case or controversy exists regarding Plaintiffs' and the other Class Members' rights and Badger's obligations under the Policies to reimburse Plaintiffs and Class Members for the full amount of Business Income losses incurred by Plaintiffs and the other Class Members in connection with the suspension of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

80.     Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Class Members seek a declaratory judgment from this Court declaring the following:

i.      Plaintiffs' and the other Class Members' Business Income losses incurred in connection with the Closure Order and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic are insured losses under their Policies; and

ii.     Badger is obligated to pay Plaintiffs and other Class Members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Order during the period of restoration and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

**COUNT II**
**ANTICIPITORY BREACH OF CONTRACT – BUSINESS INCOME COVERAGE**
**(Claim Brought on Behalf of the National Class and Nevada Subclass)**

81.     Plaintiffs repeat the allegations set forth in paragraphs 1-82 as if fully set forth herein.

82.     Plaintiffs bring this Count individually and on behalf of the other members of the National Class and Nevada Subclass.

83.     Plaintiffs' Badger Policies, as well as those of the other Class members, are contracts under which Badger was paid premiums in exchange for its promise to pay Plaintiffs' and the other Class Members' losses for claims covered by the Policy.

84. In the business interruption coverage, Badger agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

85. Badger also agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary "interruption of [their] operations" during the "period of restoration" caused by direct physical loss or damage.

86. "Business Income" under the Policies means the "Net Income (Net Profit or Net Loss before income taxes), that would have been earned or incurred", as well as "[c]ontinuing normal operating expenses incurred, including payroll".

87. The Closure Orders caused direct physical loss and damage to Plaintiffs' and the other Class Members' Covered Properties, requiring suspension of operations at the Covered Properties. Losses caused by the Closure Orders thus triggered the Business Income provision of Plaintiffs' and the other Class Members' Badger policies.

88. Plaintiffs and the other Class Members have complied with all applicable provisions of their policies and/or those provisions have been waived by Badger or Badger estopped from asserting them, and yet Badger has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

89. Upon information and belief, Badger is and has been denying coverage for any sort of business interruption claim arising from or relating to the COVID-19 pandemic without investigation into the individual circumstances of the claim.

90. By denying coverage for any Business Income losses incurred by Plaintiffs and other Class Members as a result of the Closure Orders and Orders intended to mitigate the COVID-19 pandemic, Badger has anticipatorily breached its coverage obligations under the Policies.

91. As a result of Badger's breaches of the Policies, Plaintiffs and the other Class Members have sustained substantial damages for which Badger is liable, in an amount to be established at trial.

**COUNT III**
**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the National Class and Nevada Subclass)**

92.     Plaintiffs repeat the allegations set forth in paragraphs 1-93 as if fully set forth herein.

93.     Plaintiffs bring this Count individually and on behalf of the other members of the National Class and the Nevada Subclass.

94.     Plaintiffs' Badger Policies, as well as those of other Class Members, are contracts under which Badger was paid premiums in exchange for its promise to pay Plaintiffs' and other Class Members' losses for claims covered by the Policy.

95.     Plaintiffs and other Class Members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Badger or Badger is estopped from asserting them, and yet Badger has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and Class Members are entitled.

96.     Badger has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

97.     An actual case or controversy exists regarding Plaintiffs' and other Class Members' rights and Badger's obligations under the Policies to reimburse Plaintiffs and the other Class Members for the full amount of Extra Expense losses incurred by Plaintiff and Class Members in connection with Closure Orders and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID- 19 pandemic.

98.     Pursuant to 28 U.S.C. § 2201, Plaintiffs and other Class Members seek a declaratory judgment from this Court declaring the following:

    i.    Plaintiffs' and other Class Members' Extra Expense losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic are insured losses under their Policies; and

    ii.    Badger is obligated to pay Plaintiffs and other Class Members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

**COUNT IV**
**ANTICIPITORY BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the National Class and Nevada Subclass)**

99.    Plaintiffs repeat the allegations set forth in paragraphs 1-100 as if fully set forth herein.

100.    Plaintiffs bring this Count individually and on behalf of the other members of the National Class and Nevada Subclass.

101.    Plaintiffs' Badger Policies, as well as those of the other Class Members, are contracts under which Badger was paid premiums in exchange for its promise to pay Plaintiffs' and the other Class Members' losses for claims covered by the Policy.

102.    Plaintiffs' Policies provided that Badger agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the described premises. "Extra Expense" means expenses to "avoid or minimize the suspension of business and to continue operations," and to repair or replace property.

103.    Due to the Closure Orders, Plaintiffs and other members of the Class incurred Extra Expense at their insured properties.

104.    Plaintiffs and other members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Badger or Badger is estopped from asserting them, and yet Badger has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

105.    Upon information and belief, Badger is and has been denying coverage for any sort of business interruption claim arising from or relating to the COVID-19 pandemic without investigation into the individual circumstances of the claim.

106.    By denying coverage for any Extra Expense losses incurred by Plaintiffs and other members of the Class in connection with the Closure Order and Orders intended to mitigate the COVID-19 pandemic, Badger has breached its coverage obligations under the Policies.

107.   As a result of Badger's breaches of the Policies, Plaintiffs and the other members of the Class have sustained substantial damages for which Badger is liable, in an amount to be established at trial.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against the Defendants as follows:

(1)   Declaring this action to be a proper class action maintainable pursuant to Fed.R.Civ.P. 23(a) and Rules 23(b)(2) and (b)(3) and declaring Plaintiffs and their counsel to be representatives of the Class;

(2)   Issuing a Declaratory Judgment declaring the Parties' rights and obligations under the insurance policies;

(3)   Awarding Plaintiffs and the Class compensatory damages from Badger's breach of the insurance policies in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

(4)   Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses; and

(5)   Awarding such other and further relief the Court deems just, proper, and equitable.

### <u>DEMAND FOR A JURY TRIAL</u>

Plaintiffs and the Class request a jury trial for all Counts for which a trial by jury is permitted by law.

DATED:  April 28, 2020                    THE O'MARA LAW FIRM, P.C.


/s/ David C. O'Mara
_____
DAVID C. O'MARA, ESQ.

THE O'MARA LAW FIRM, P.C.
DAVID C. O'MARA, ESQ
Nevada Bar No. 8599
311 E. Liberty Street
Reno, Nevada 89501
Telephone:  775.323.1321
david@omaralaw.net

1   James E. Cecchi
    Lindsey H. Taylor
2   CARELLA, BYRNE, CECCHI
    OLSTEIN, BRODY & AGNELLO
3   5 Becker Farm Road
    Roseland, New Jersey 07068
4   (973) 994-1700

5   Christopher A. Seeger
    Stephen A. Weiss
6   SEEGER WEISS
    77 Water Street, 8th Floor
7   New York, New York 10005
    (212) 584-0700

8
    Samuel H. Rudman
9   ROBBINS GELLER RUDMAN
      & DOWD LLP
10  58 South Service Road, Suite 200
11  Melville, NY  11747
    (631) 367-7100
12
    Paul J. Geller
13  Stuart A. Davidson
    ROBBINS GELLER RUDMAN
14    & DOWD LLP
    120 East Palmetto Park Road, Suite 500
15  Boca Raton, Florida 33432
    (561) 750-3000
16

17                      Attorneys for Plaintiff
18

19

20

21

22

23

24

25

26

27

28